118 F.3d 955
 1997 Copr.L.Dec. P 27,679, 38 Fed.R.Serv.3d 623,
43 U.S.P.Q.2d 1385
 SOFTEL, INC., Plaintiff-Appellant,
v.
DRAGON MEDICAL AND SCIENTIFIC COMMUNICATIONS, INC.; Dragon
Group Ltd., also known as Dragon Medical and Scientific
Communications, Ltd.; John R. Darsee; H. Eugene Hodge;
Nina Romanoff, Defendants-Appellees.
 No. 59, Docket 95-9151.
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 12, 1996.
Decided July 9, 1997.
 
 Charla R. Bikman, New York City, for Plaintiff-Appellant.
 Bruce H. Schneider, New York City, (Gordon M. Kessler, Stroock & Stroock & Lavan, New York City, William A. Rome, Jaffe and Asher, New York City, of counsel), for Defendants-Appellees Dragon Medical & Scientific Communications, Inc., John R. Darsee and H. Eugene Hodge.
 Before: MINER, ALTIMARI, and PARKER, Circuit Judges.
 PARKER, Circuit Judge:
 
 
 1
 Softel, Inc., a computer software company, brought this action against Dragon Medical and Scientific Communications, Inc. ("Dragon"), its parent Dragon Group, Ltd., and several of its employees (collectively "the defendants") claiming that the defendants had infringed copyrights Softel held in several of its computer programs, and had misappropriated trade secrets contained within the computer code. Softel also alleged that the defendants were guilty of "reverse palming off" under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and that the defendant corporation's president was vicariously and contributorily liable for damages. In a bench trial, the district court (John M. Cannella, Judge ) found the defendants liable on some of plaintiff's copyright infringement and trade secret claims, but not on others, and rejected plaintiff's claims based on the Lanham Act and vicarious or contributory liability. In a separate proceeding, the court (Miriam G. Cedarbaum, Judge ) awarded damages accordingly. We affirm in part and, because the district court's findings and holdings do not address all of plaintiff's claims, vacate and remand in part.
 
 I. BACKGROUND
 
 2
 Softel is a small New Hampshire corporation engaged in the business of creating and selling computer graphics products. Paul Fiondella is its president and sole shareholder. Dragon is a New Jersey corporation engaged in the business of designing communications programs relating to medical and scientific information. H. Eugene Hodge is Dragon's president and a shareholder of Dragon; Nina Romanoff is a Dragon employee who produced various films and videotapes for Dragon; John R. Darsee is a medical writer and computer programmer for Dragon. See SOFTEL, INC. V. DRAGON MED. & SCIENTIFIC COMMUNICATIONS, INC., NO. 87 CIV. 0167, 1992 WL 168190, AT F.F. PP 1-6 (S.D.N.Y. JUNE 30, 1992)[1] (" Softel II ").
 
 
 3
 In January 1993, Fiondella developed Videogram 1.0, a "paint-and-draw" computer graphics program.[2] Later in 1983, Fiondella developed an improved version of this program, Videogram 2.0. In 1984, Pfizer Laboratories hired Dragon to produce a program which later became known as Heartlab. Darsee saw an advertisement for Videogram 2.0, and called Fiondella with some questions regarding its capabilities. Dragon employee Darsee purchased the software, and some hardware, from Fiondella. Fiondella delivered the goods personally to Dragon's place of business in New York, so that he could explore any potential business opportunities for his company at Dragon. Fiondella and Darsee discussed forming a joint venture to create an "authoring language" and Darsee asked Fiondella to create a simulation of a beating heart for the Heartlab project.
 
 
 4
 In January 1985, E.R. Squibb & Sons, Inc. hired Dragon to create an interactive videotape program for training purposes. This project was called Azactam. Dragon hired Fiondella to write computer code for this project. Fiondella was careful not to provide his source code[3] to Dragon and imbedded a copyright notice in Softel's portion of the source code and in the executable[4] delivered to Dragon.
 
 
 5
 Dragon had also contracted to produce videodisc programs with Roche Laboratories. These would come to be known as Melanoma, Kaposi's Sarcoma ("Kaposi"), and Hairy Cell Leukemia. Dragon engaged Fiondella to write code to control the operation of the touchscreen and videodisc player in the program Melanoma, and to retrieve and display graphic images produced by Dragon artists. Fiondella wrote this code in a modular[5] style. He also used a manual produced by the hardware manufacturer to interface the hardware and software properly. He billed Dragon on a per diem basis, delivered only the executable version of his program, and imbedded a copyright notice in the executable.
 
 
 6
 Fiondella also worked on Kaposi, using code that was similar to that used in Melanoma. He employed several design techniques in writing the Kaposi code, including, among others, the use of external files, English language commands, modular structure, and a hierarchical series of menus and a touchscreen. This program also was delivered in executable form only, and with an imbedded copyright notice.
 
 
 7
 At about the time that Kaposi was finished, Dragon hired Fiondella to work on a project called Sorbinil. Fiondella wrote code for this project and submitted an executable to Dragon. However, as the deadline for the project approached, problems developed with the program. Dragon called Fiondella to ask him to come to Dragon's office in New York and fix the program, but Fiondella was out of town. A friend of Fiondella's went to Dragon's office instead, and managed to fix the immediate problem by following Fiondella's instructions over the telephone.
 
 
 8
 Unfortunately, additional problems arose. Fiondella himself went to Dragon's premises on June 17, 1985. Fiondella and one of Dragon's freelance computer programmers entered into a heated argument over whose code was causing the problem. The freelance programmer demanded that Fiondella turn over his code, so that the programmer could examine it himself. When Fiondella refused, the programmer stated that he had the ability to get Fiondella's code off Dragon's computers anyway, because he could "unerase" the code that Fiondella had put on the computers during his visits there and (seemingly) erased upon leaving. Fiondella became enraged. Dragon's president, Hodge, was present at the altercation and decided that because Fiondella had acted unprofessionally, he could no longer work for Dragon. Fiondella successfully fixed the problems with the software shortly after that.
 
 
 9
 Defendant Darsee then gained access to the code that Fiondella had put on Dragon's computers and seemingly erased.
 
 
 10
 In June 1985, Dragon produced the third videodisc program for Roche, Hairy Cell Leukemia. Roche wanted two versions: Hairy Cell U.S. and Hairy Cell Europe. Dragon produced an interim version called Hairy Cell Roche for distribution to Roche's European subsidiaries, but did not keep a copy because Dragon considered it to be an interim program.
 
 
 11
 In 1986, Dragon made a program for Pfizer called Low Back Pain. This program included the Backpain Expert Module. Shortly thereafter, Dragon produced a program called Heartlab for Pfizer. Darsee wrote the code for this program, except for the animation and image retrieval routines, which were Fiondella's. Fiondella was paid for this code.
 
 
 12
 Defendants admit that Hairy Cell Roche, Low Back Pain, and Heartlab used Fiondella's image retrieval routines.
 
 
 13
 Late in 1985, Darsee began to develop a paint-and-draw program called Paintbox. The early version of this software included Fiondella's image retrieval routines. Darsee sent a letter to the Kurta Corporation suggesting that Dragon and Kurta co-marketing some of the programs Dragon had developed, including Paintbox. Nothing came of this suggestion.
 
 
 14
 About this time, Dragon began to market itself as having a division called Dragon Expert Systems that specialized in interactive technology. Dragon sponsored a hospitality suite at a conference of the American Association of Family Practitioners on October 9-11, 1985. It solicited interest in this presentation by sending letters to prospective clients and issuing a press release describing itself as a group of physicians and artists capable of producing computer images. No evidence was adduced showing that any sales resulted from this presentation.
 
 
 15
 In May of 1986, Softel sought, and was granted, a copyright registration for a package of programs that included the following: (1) a program written in BASIC entitled "SHOWPIX.bas," which is an image retrieval routine; (2) a collection of object code routines called "8068/8 Support Routines," which included assembly code routines used to retrieve and display images; and (3) the source code for the Kaposi program.
 
 
 16
 In November 1986, Darsee exhibited the program Hairy Cell Roche at a meeting of the International Interactive Communications Society. He did not credit Fiondella or Softel for any of the code contained therein. The presentation did not produce any business.
 
 
 17
 In early 1987, Softel filed this suit alleging, inter alia, that the defendants had infringed copyrights Softel held in its programs, had misappropriated trade secrets in the code, and had violated § 43(a) of the Lanham Act.
 
 
 18
 In 1988, after the commencement of this litigation, Dragon made the following programs, which Softel claims are also infringing: Unasyn, Micro, OB/GYN, Managed Health Care, Heart Command (collectively, the "post-litigation programs"). These programs are written in a different computer language than Fiondella's original code, and are designed to work with different hardware.
 
 
 19
 During discovery, Softel attempted to change its outside trial expert witness,[6] but the new expert was unable to meet a discovery deadline imposed by Magistrate Judge Nina Gershon. Magistrate Judge Gershon forbade Softel to rely at trial on any outside expert other than its original one. The district court affirmed this preclusion order. See Softel, Inc. v. Dragon Med. & Scientific Communications, Inc., No. 87 Civ. 0167, 1990 WL 164859, at * 8 (S.D.N.Y. Oct. 24, 1990) ("Softel I "). The case then went to a bench trial before Judge Cannella in late April and early May 1991. The Judge found, inter alia, that the defendants' pre-litigation programs infringed Softel's programs, and that the defendants had misappropriated the trade secrets contained within Softel's image retrieval routines. There is no appeal from those findings or the damages ultimately assessed in connection with them. However, the judge rejected Softel's claims of infringement in the post-litigation programs, as well as its Lanham Act and trade secret claims. See Softel II. Several years later, the issue of damages was tried before the Hon. Miriam G. Cedarbaum, who awarded Softel $34,880.28 compensatory damages on its copyright infringement and trade secret misappropriation claims, as well as $100,000 punitive damages against Darsee and $150,000 punitive damages against Dragon for willful trade secret misappropriation. See Softel, Inc. v. Dragon Med. & Scientific Communications, Inc., 891 F.Supp. 935, 946 (S.D.N.Y.1995) ("Softel III "). Judge Cedarbaum subsequently reduced the punitive damages awards to $35,000 against Darsee and $50,000 against Dragon. See Softel, Inc. v. Dragon Med. & Scientific Communications Inc., No. 87 Civ. 0167, 1995 WL 606307, at * 2 (S.D.N.Y. Oct. 16, 1995). Softel appeals the trial court's preclusion of its trial expert and the rejection of its copyright infringement claims relating to the post-litigation programs. It also appeals the dismissal of its Lanham Act and trade secret claims (including the damages calculation under the latter) and the court's rejection of its claim that Hodge was vicariously or contributorily liable for infringement. We affirm the trial court's rulings, except that we remand the case for further consideration of Softel's claims that Dragon's post-litigation programs infringed the copyrightable structure of Softel's programs, and that the post-litigation programs misappropriated trade secrets in Softel's programs.
 
 II. DISCUSSION
 A. Preclusion of Softel's Expert
 
 20
 In December 1989, Magistrate Judge Gershon set a discovery cutoff date of January 30, 1990. At a pretrial conference on December 6, 1989, Softel advised Magistrate Judge Gershon that it was substituting a new expert, Dr. Thomas A. DeFanti, for its former expert, Aaron Grosky. Magistrate Judge Gershon agreed to allow Softel to serve a report by its new expert, but said that the new expert's report must be submitted by December 22, so that Dragon would have time to respond before the deadline. Softel I at * 2. Softel also announced that its first expert, Grosky, refused to return the diskettes that contained the programs at issue in the litigation, because of a fee dispute. Apparently, Softel had not made duplicates of the diskettes before giving them to Grosky. Dragon agreed to duplicate the disks it had, and delivered 175 disks to Softel a few days later, on December 11, and a few remaining diskettes a week later, on December 18, three days before the discovery cutoff deadline. On December 21 (the day before the deadline), Softel asked that the date be extended, as DeFanti needed more time to review the materials. On January 8, 1990, Magistrate Judge Gershon refused to extend the deadline, holding that Softel had produced no justified explanation. On January 12, Magistrate Judge Gershon explained this preclusion order as disallowing Softel from presenting at trial the testimony of any expert witness from outside the company except that of the expert originally designated, i.e., Grosky. Softel objected to these rulings pursuant to Fed.R.Civ.P. 72(a) but Judge Cannella upheld both rulings. See id. At trial, Judge Cannella also rejected Softel's attempt to have DeFanti's report introduced as rebuttal evidence, stating that the tenor of his first order had been that Grosky would be the only outside expert witness for Softel, and that this order included Softel's rebuttal case. Softel challenges these rulings as abuses of discretion on the part of the district court.
 
 
 21
 We review the district court's order for abuse of discretion. See Update Art, Inc. v. Modiin Publ'g, Ltd., 843 F.2d 67, 71-72 (2d Cir.1988). In determining whether a district court has exceeded its discretion, we consider the following factors: (1) the party's explanation for the failure to comply with the discovery order; (2) the importance of the testimony of the precluded witness; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance. See Outley v. City of New York, 837 F.2d 587, 590-91 (2d Cir.1988).
 
 
 22
 With respect to the first Outley factor, we note that Softel was allowed to change its expert roughly sixty days before the discovery deadline on the condition that the new expert file his report roughly a month later, i.e. by December 22. Softel's explanation for its failure to comply with this deadline was that DeFanti did not have enough time to conduct his inquiry because he did not have access to the relevant diskettes until shortly before the deadline. This explanation is inadequate. Softel could have provided its new expert with additional time in a variety of ways: it could have retrieved its diskettes from Grosky by paying him the disputed fee and then suing for the alleged overcharge, it could have made copies of the diskettes before giving them to Grosky, or, most obviously, it could have notified the court and the defendant of the fee dispute several months earlier than it did. Dragon cannot be charged with the burden of producing the diskettes from which DeFanti was to work: it gave additional copies of these disks to Softel as an accommodation.
 
 
 23
 Softel directs our attention to Potlatch Corp. v. United States, 679 F.2d 153 (9th Cir.1982). In that case, which involved a complicated tax dispute, the government advised the court when it was first setting discovery deadlines that it had not yet hired an expert, and that all of the experts it had interviewed had estimated that work on the project would take six months. See id. at 154. The court set a deadline of six months later. When the government failed to meet this deadline, the district court excluded the experts' testimony. The Ninth Circuit reversed, taking into account the following facts: the district court's deadline could reasonably have been construed by the government to have been a precatory one; government attorneys must endure considerable red tape in order to hire an expert; the government did not control the experts; and, finally, the taxpayer delayed also. See id. at 155-56. We believe Potlatch is distinguishable on these facts. In this case, the deadline was clearly not precatory, Softel did not have to deal with governmental red tape to hire its witness, and, perhaps most importantly, the district court was not notified that the expert would not be able to comply with the deadline until the day before the deadline itself--a far cry from the situation in Potlatch where the government notified the court at the initial status conference. Discovery in this case began in early 1987 and ended in January 1990: Softel does not claim that an expert could not have completed the required analysis within that time. Instead, it claims that the time it was granted after it decided to change experts late in the period, and after it had (not irretrievably) lost its only copy of the relevant materials to its first expert, was inadequate for it to alter or bolster portions of discovery that had already taken place. On these facts, Potlatch avails them naught.
 
 
 24
 The second Outley factor--the importance of the testimony of the precluded witness--cuts in favor of Softel, but only slightly. While it is of course important to have an expert in a technical trial such as this, Softel did have another expert it could, and did, use: Softel's president, Fiondella. Softel was denied the opportunity to bolster Fiondella's testimony with DeFanti's, but this prejudice is slight when compared with, for example, that suffered by the plaintiff in Outley, whose only corroborating fact witnesses had been excluded in a trial in which credibility was the crucial issue. See Outley, 837 F.2d at 590-91. Moreover, Softel was given an opportunity to enter both of Grosky's reports into evidence, but apparently chose not to do so. Under these circumstances, the prejudice resulting from the preclusion of DeFanti was slight, and hardly "tantamount to a dismissal," as Softel claims.
 
 
 25
 The third Outley factor is the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony. In Outley, this burden was slight. There, the plaintiff alleged police misconduct, and sought to put on two eyewitnesses. This Court noted that "a brief interview would have allowed the [defendant] to probe the ability of the witnesses to observe, to find out why [the witnesses] were on the street, and to uncover weaknesses or conflicts in their testimony." Id. at 591. We also specifically noted that "the testimony [of the witnesses] was not the technical or specialized evidence given by an expert witness." Id. Here, the excluded testimony was expert testimony. Moreover, the parameters of the dispute in a highly technical case such as this are largely defined by expert testimony. Therefore, any differences between DeFanti's testimony and Grosky's would have redrawn the boundaries of the case and almost certainly have prejudiced Dragon's ability to meet Softel's attack. Because Dragon would have been forced, at a very late date in the discovery process, to accommodate potentially significant shifts in the theories being offered against it, this factor cuts in favor of Dragon.
 
 
 26
 The final Outley factor is the availability of a continuance. Here, no trial date had been set, and a continuance was available. However, expeditious management of discovery schedules is especially important in cases of this nature because they require extensive expert involvement over lengthy periods of time. Therefore, the burden on the trial court of granting a continuance is greater than in some other cases. Softel points to the fact that this case did not go to trial for many months after the preclusion order as evidence of the propriety of a continuance. This of course is 20/20 hindsight. Had the court granted a continuance for Softel, it probably would have had to grant additional time for Dragon to respond. When trial courts permit deadline slippage of this sort, trials cannot be scheduled when they ought to be, resulting in the backup of other cases and eventual scheduling chaos as a series of bottlenecks builds. Additionally, the enormous length of every step of the proceedings in this case militated against any more continuances. Denial of a continuance in the circumstances was certainly within the sound discretion of the trial judge.
 
 
 27
 The first, third, and fourth Outley factors cut against Softel; the second cuts only slightly in its favor. On balance the Outley factors make clear that the lower court's ruling was not an abuse of discretion. We therefore affirm it.
 
 B. Copyright Infringement
 
 28
 "In any suit for copyright infringement, the plaintiff must establish its ownership of a valid copyright, and that the defendant copied the copyrighted work." Computer Assocs. Int'l, Inc. v. Altai, Inc., 982 F.2d 693, 701 (2d Cir.1992). Copying may be shown by direct evidence or by showing that "(1) the defendant had access to the plaintiff's copyrighted work and (2) that defendant's work is substantially similar to the plaintiff's copyrightable material." Id. Judge Cannella found that Dragon had access to Softel's source code, Softel II at F.F. p 62, and that some of this code was copied directly into two of Dragon's pre-litigation programs, see id. at F.F. pp 70, 74. Judge Cannella held that these two programs infringed Softel's copyrights. See id. at C.L. pp 9-24. However, Judge Cannella rejected Softel's claim that several of Dragon's post-litigation programs infringed Softel's copyrights as well. He held that the post-litigation programs were not similar to Softel's programs in any way that was copyrightable. See id. at C.L. pp 28-34.
 
 
 29
 On this appeal, Softel renews its claim that Dragon's post-litigation programs infringed copyrights held by Softel. Softel argues that it claimed in the district court that its software combined certain computer programming design elements in an expressive way and that Dragon had copied that expression, but that Judge Cannella ignored this claim and instead addressed (and rejected) a claim that Softel had not made, to wit, that each of the design elements, taken individually, was protectible expression.
 
 
 30
 It is well-established in this Circuit that non-literal similarity of computer programs can constitute copyright infringement. See Altai, 982 F.2d at 702. We have prescribed an "abstraction-filtration-comparison" method of analysis for determining whether a program has been infringed. See id. at 706-12. Under this analysis, the allegedly infringed program is first broken down and examined at varying levels of abstraction. See id. at 706-07. Second, the allegedly infringed program is "filtered" at each level of abstraction through various copyright doctrines that deny protection to certain types of materials. For example, the scene a faire doctrine denies protection to program elements that are dictated by external factors such as "the mechanical specifications of the computer on which a particular program is intended to run" or "widely accepted programming practices within the computer industry." Id. at 709-10. Third, the resulting protectible expression is compared with the allegedly infringing program. See id. at 710-11.
 
 
 31
 Our application of this method of analysis to the facts of Altai demonstrates that an allegation of infringement based on similarities in architecture cannot be ignored merely because many or all of the design elements that make up that architecture are not protectible when considered at a lower level of abstraction. In Altai, the district court held many aspects of the program at issue in that case to be not protectible for various reasons (e.g., because they were in the public domain or were computer scenes a faire ). Nevertheless, the court proceeded to a higher level of abstraction and responded to the plaintiff's claim of infringement based on alleged similarities between the two programs' "organizational charts." Computer Assocs. Int'l, Inc. v. Altai, Inc., 775 F.Supp. 544, 562 (E.D.N.Y.1991). In reviewing that claim, the trial court made no effort to remove from its analysis those elements of the program that had been found unprotectible at the lower level of abstraction. Instead, analyzing the program at the higher level of abstraction, it rejected the organizational claim on the grounds that the structure alleged to have been infringed was "simple and obvious to anyone exposed to the operation of the program[s]." Id. This Court approved that approach, adding only that the district court's use of the word "obvious" should be understood to be a holding that the purportedly infringed structure was a scene a faire. See Altai, 982 F.2d at 714-15.
 
 
 32
 The foregoing approach is consistent with the Supreme Court's decision in Feist Publications, Inc. v. Rural Telephone Service Co., 499 U.S. 340, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991), discussed by this Court in Altai, 982 F.2d at 711-12. In Feist, the Court made quite clear that a compilation of non-protectible elements can enjoy copyright protection even though its constituent elements do not. See Feist, 499 U.S. at 344-51, 111 S.Ct. at 1286-90. A district court in another circuit has illustrated the danger of overlooking this aspect of copyright law with an astute hypothetical:
 
 
 33
 Suppose defendant copied plaintiff's abstract painting composed entirely of geometric forms arranged in an original pattern. The alleged infringer could argue that each expressive element (i.e., the geometric forms) is unprotectible under the functionality, merger, scenes a faire, and unoriginality theories and, thus, all elements should be excluded prior to the substantial similarity of expression analysis. Then, there would be nothing left for purposes of determining substantial similarity of expression. In this example, elimination of "unprotectible" elements would result in a finding of no copyright infringement, which would be clearly inconsistent with the copyright law's purpose of providing incentives to authors of original works.
 
 
 34
 Apple Computer, Inc. v. Microsoft Corp., 779 F.Supp. 133, 136 (N.D.Cal.1991), aff'd in relevant part and rev'd and remanded in part, 35 F.3d 1435, 1444 (9th Cir.1994). Scholars agree:
 
 
 35
 Although the ... scrutiny involved in the level-by-level analysis may deny protection to some individual program elements, it must be remembered that a combination of these elements may be protectable. An original arrangement of uncopyrightable or public domain works--even facts--is as copyrightable as a compilation in the computer context as it is elsewhere in copyright law. Thus, individual program elements that are "filtered" out at one level may be copyrightable when viewed as part of an aggregate of elements at another level of abstraction.
 
 
 36
 Arthur R. Miller, Copyright Protection for Computer Programs, Databases, and Computer-Generated Works: Is Anything New Since CONTU?, 106 Harv. L.Rev. 977, 1003 (1993) (footnote omitted); see also 3 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 13.03[F], at 13-145 (1996) ("Nimmer ") ("In performing the filtering, the court should be sensitive to the myriad ways in which copyrightable creativity can manifest itself; the analysis should not proceed mechanically simply by isolating physical elements out of the copyrightable work.").[7] Indeed, when applied to the context of literary works, this point becomes quite obvious: taken individually, the words that constitute a literary work are not copyrightable, yet this fact does not prevent a literary text, i.e., a collection of words, from enjoying copyright protection. See Nimmer § 13.03[F], at 13-145 n.345.1 (explaining that the fact that Hamlet's soliloquy can be atomized into unprotectible words does not mean that the soliloquy as a whole lacks originality for copyright purposes).[8]
 
 
 37
 We now turn to Softel's argument that Judge Cannella's findings and holdings fail to address adequately its claim of structural infringement in the post-litigation programs.[9] Softel points out that in its Post-Trial Memorandum of Law it summarized its claim as follows:
 
 
 38
 Plaintiff makes no claim that the individual elements used to create the copyrighted code are themselves separately copyrightable in the abstract. What plaintiff claims is that the way the elements are expressed in computer code and the way the elements are integrated with each other constitutes copyrightable matter.
 
 
 39
 Pl.'s Responsive Post-Trial Mem. of Law at 8-9 (cited by Appellant's Br. at 28-29). In this same document, Softel also asserted that "plaintiff's authoring language which integrates hierarchical menus, touchscreens, modules, external files and English-language commands is an original expression which is copyrightable." Id. at 12 n. 4. Finally, in its Trial Memorandum, which Judge Cannella cites in his summary of Softel's claims, see Softel II at C.L. p 28, Softel makes the following statement:
 
 
 40
 The genius of the structure, sequence and organization of plaintiff's program is the way in which it receives, assembles, calculates, retains, correlates and produces information on screen. Since there are other ways of performing those functions to achieve the same purpose as the Softel program, plaintiff's copyrighted work is a protectable expression of ideas which cannot be infringed with impunity.
 
 
 41
 Pl.'s Trial Mem. at 38 (emphasis in original and internal quotation marks omitted).[10]
 
 
 42
 Softel supported this theory with the testimony of Fiondella and with cross-examination of the defendants' expert, Cain. Fiondella testified that his software used external files, modular programming, and English language commands, and that "each command in those external command files is translated by the program into the execution of certain modules." He asserted that "[y]ou would find in the Dragon programs the same structure." He also testified that the specific commands employed in Dragon's program were functionally identical with the fifteen commands employed in Softel's software. He then explained that the menus cued the command files. Finally, in its cross-examination of Dragon's expert, Softel explored the question of whether there were alternative ways to design a program such as Softel's, and whether Dragon's post-litigation programs had "evolved" from Softel's.
 
 
 43
 Thus, Fiondella testified regarding relationships between all four of the design elements at issue: apparently, the menus cued external files which read English language commands into the main program, where the commands cued modules of code. Standing alone, these allegations may not help answer the question of how many ways existed to design a computer program with the same functionality as Softel's. However, when they are combined with an allegation that the specific commands used by Dragon were nearly identical with Softel's, they do appear to establish at least a colorable claim that there was a modicum of expression in the design of the program and that Dragon infringed that expression. That is, even if there were few ways to design such a program, it does not seem likely that Dragon would have to use an identical structure and copy approximately fifteen out of fifteen commands.
 
 
 44
 Softel presented an argument, supported by some evidence, that the manner in which it had combined certain computer design elements was expressive for purposes of copyright law, and that Dragon had copied this expression. Keeping in mind that the requisite level of originality for copyright protection is "minimal" and "extremely low," Feist, 499 U.S. at 345, 111 S.Ct. at 1287 we cannot say that Softel's claim was without merit on its face. However, several aspects of Judge Cannella's opinion reveal that he either ignored or misanalyzed Softel's argument, and consequently failed to perform the Altai analysis at the highest level of abstraction--here, the interrelationships among the four identified elements.
 
 
 45
 First, the Judge's statements of his understanding of Softel's claims reveal that the Judge understood Softel to be claiming only that each element, taken individually, was expressive. In his findings of fact, Judge Cannella summarized his understanding of Softel's claims as follows:
 
 
 46
 Plaintiff argues that [certain of Fiondella's programming decisions] constitute the structure, sequence and organization of his copyrighted work and that Dragon's post-litigation programs are infringing because they contain these elements. The elements which plaintiff claims are entitled to copyright protection are the use of the following:
 
 
 47
 (1) an external file structure;
 
 
 48
 (2) English language command[s];
 
 
 49
 (3) functional modules, specifically including those to operate the hardware; and
 
 
 50
 (4) a hierarchical series of menus with a touchscreen.
 
 
 51
 Softel II at F.F. p 107. In his conclusions of law, the judge stated an understanding of Softel's claims that was essentially identical to his previous statement. Compare id. with id. at C.L. p 25. Moreover, the Judge repeatedly stated that Softel sought to preclude Dragon from using any of the design elements, however combined. See, e.g., id. at F.F. p 107 ("Plaintiff argues that ... Dragon's post-litigation programs are infringing because they contain these [four design] elements."); id. at C.L. p 29 ("Softel merely argues that both programs utilize menus.").
 
 
 52
 Second, the court's findings of fact and conclusions of law address each element individually, but not in relation to each other. For example, the court credited Dragon's expert testimony that each of the four design elements was pervasively used in the computer industry, see id. at F.F. pp 108, 110, 111, 112, but did not address the issue of whether the choice and manner of combination of the four elements was commonplace. Similarly, the court found that the programmer at Dragon who was responsible for the post-litigation programs had learned to use external files from another source, see id. at F.F. p 109, and that certain code is required whenever a screen touchpoint is used, see id. at F.F. p 113, but did not address the question of where Dragon's programmer learned to combine external files, or touchpoint finger-finding algorithms, with the other design elements.
 
 
 53
 Third, the court makes the following statement: "Since each of the elements which plaintiff claims are entitled to copyright protection are filtered out at the second step of the Second Circuit's analysis set forth in [Altai ], it is unnecessary for the Court to proceed to the third part of the analysis." Id. at C.L. p 33. If by this statement the district court meant that there is no need to analyze alleged structural similarities between the programs because all of the constituent elements of the allegedly infringed program's structure have been found to be individually unprotectible, then the statement is erroneous, as our discussion of Altai and Feist, above, reveals. If, on the other hand, the district court meant only that there is no need to compare scenes a faire because they are unprotectible in any event, then the statement is not erroneous but provides further evidence that the district court understood Softel to be claiming only that the four design elements were separately protectible.
 
 
 54
 It is true that the court, in addressing Softel's claim that Dragon's program had "evolved" from Softel's, made two statements that appear to address the issue of the manner in which the design elements are combined. First, it stated that "the post-litigation programs were significantly different from [Softel's program] in the following respects: (1) code; (2) command sets and processing of commands; (3) internal file structure; (4) processing of files; (5) command file interaction structure; and (6) organization of and relationship between modules of code." Id. at F.F. p 114. Second, it stated that the post-litigation programs "were not in any way derived from plaintiff's copyrighted work." Id. at F.F. p 115. These statements, however, do not alter the conclusion that the district court ignored or misanalyzed Softel's claim. The court's announcement that it would not engage in Altai comparison analysis, see supra, makes it very doubtful that the court had compared Softel's selection and arrangement of commands or code modules that were individually unprotectible when it made the former statement, or that it considered mimicking a structure comprising unprotectible elements to be "derivation" when it made the latter.
 
 
 55
 Whether the district court ignored Softel's claim or misanalyzed it, its treatment of that claim was inadequate, because it failed to apply the Altai test to the interrelationship among the design elements. Therefore, we vacate the district court's judgment as to Softel's claim of non-literal infringement in Dragon's post-litigation programs and remand so that the district court may enter a finding as to whether the manner in which Softel combined the various design elements in its software was protectible expression, and, if it was, whether Dragon infringed that expression. We express no opinion as to the merit of Softel's claim.
 
 C. Trade Secret
 1. Choice of Law
 
 56
 As this case has contacts with at least three states--Softel is a New Hampshire Corporation; Dragon is a New Jersey corporation; and the theft of the trade secrets apparently occurred at Dragon's offices located in New York--we pause to consider the applicable state law. Neither party has directly addressed the issue of which law should apply to this case: Dragon, in its brief, has cited New York cases and federal cases construing New York law, while Softel has cited cases from all over the map.
 
 
 57
 Softel's trade secret claims are governed by state law. See Franke v. Wiltschek, 209 F.2d 493, 494 (2d Cir.1953). In choosing the applicable state law, we employ the choice of law rules of the forum state, in this case New York. See Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc., 933 F.2d 131, 137 (2d Cir.1991) (citing Krauss v. Manhattan Life Ins. Co., 643 F.2d 98, 100 (2d Cir.1981)); see also Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496-97, 61 S.Ct. 1020, 1021-22, 85 L.Ed. 1477 (1941). New York applies an "interest analysis" to its choice of law, under which the law of the jurisdiction having the greatest interest in the litigation controls. See Passalacqua Builders, 933 F.2d at 137 (citing Intercontinental Planning, Ltd. v. Daystrom, Inc., 24 N.Y.2d 372, 382, 248 N.E.2d 576, 582, 300 N.Y.S.2d 817, 825 (1969)). Although both Dragon and Softel are out-of-state corporations, we are convinced that a New York court would apply New York law to this case for the following reasons: (1) the defendant maintains offices in New York; (2) the plaintiff apparently maintains an apartment and de facto office in New York; and (3) the misappropriation, if any, apparently took place in New York, at Dragon's offices. Cf. Cousins v. Instrument Flyers, Inc., 44 N.Y.2d 698, 699, 376 N.E.2d 914, 915, 405 N.Y.S.2d 441, 442 (1978) (per curiam) ("It is true that lex loci delicti remains the general rule in tort cases to be displaced only in extraordinary circumstances.").
 
 
 58
 2. New York Substantive Law of Trade Secrets
 
 
 59
 New York generally looks to section 757 of the first Restatement of Torts for its definition of a trade secret. See Ashland Management Inc. v. Janien, 82 N.Y.2d 395, 407, 624 N.E.2d 1007, 1012, 604 N.Y.S.2d 912, 917 (1993); Delta Filter Corp. v. Morin, 108 A.D.2d 991, 992, 485 N.Y.S.2d 143, 144 (3d Dep't 1985) (per curiam); see, e.g., Eagle Comtronics, Inc. v. Pico, Inc., 89 A.D.2d 803, 453 N.Y.S.2d 470 (4th Dep't 1982). Under this definition, a trade secret is "any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." Restatement of Torts § 757 cmt. b, at 5 (1939) (quoted in Ashland, 82 N.Y.2d at 407, 624 N.E.2d at 1013, 604 N.Y.S.2d at 918). "[I]t is not simply information as to single or ephemeral events in the conduct of the business"; rather, it "is a process or device for continuous use in the operation of the business." Id. New York has recognized that a computer program can be a trade secret. See Integrated Cash Management Servs., Inc. v. Digital Transactions, Inc., 732 F.Supp. 370, 375 (S.D.N.Y.1989) ("Integrated Cash Mngt. I "), aff'd, 920 F.2d 171 (2d Cir.1990) ("Integrated Cash Mngt. II "); Belth v. Insurance Dep't, 95 Misc.2d 18, 406 N.Y.S.2d 649 (Sup.Ct.1977).
 
 
 60
 The district court found that the image retrieval routines were a protectible trade secret, and that Dragon had used these secrets after discovery by improper means. Softel II at C.L. pp 43-44. However, the court found that the structure, sequence and organization of Softel's code was not a protectible trade secret for two reasons: (1) "Fiondella freely discussed his use of menus, English language commands, functional modules and external files with Darsee," id. at C.L. p 42, and (2) "the evidence established that these elements were not novel or original," id. (citing Ferber v. Sterndent Corp., 51 N.Y.2d 782, 783-84, 412 N.E.2d 1311, 1312, 433 N.Y.S.2d 85, 86 (1980)).
 
 
 61
 These findings do not address Softel's claim that the sequence and organization of its code, i.e., the manner of combination of the various design elements, was a protectible trade secret. The fact that Fiondella told Darsee that his code contained four design elements does not disclose the manner of their combination. Cf. Integrated Cash Mngt. II, 920 F.2d at 174 (stating, in a case under New York law, that a "user-oriented description" of a computer program is not a disclosure of a trade secret). It may be that Fiondella disclosed the specific manner as well, but the district court's finding does not make this clear. Likewise, the court's holding that the four design elements were not novel or original does not address Softel's claim that the combination of the elements is a trade secret. See id. (stating that a combination of public domain elements may be a trade secret); SmokEnders, Inc. v. Smoke Watchers Int'l, Inc., 179 U.S.P.Q. 111, 112 (N.Y.Sup.Ct.1973) (same). Therefore, neither of the court's findings addressed Softel's claim and a remand is required.
 
 
 62
 We also caution the district court on its use of the term "novelty." Under the Restatement's approach, novelty--at least as that term is used in patent law--is not required in a trade secret. See Restatement of Torts § 757 cmt. b, at 6-7 ("Novelty and invention are not requisite for a trade secret as they are for patentability."). The district court may have been using the term "novelty" as that term is used in a line of New York cases perhaps best known as "submission of ideas" cases.[11] These cases, and their requirement of novelty, were recently explained by the New York Court of Appeals in Apfel v. Prudential-Bache Securities, Inc., 81 N.Y.2d 470, 616 N.E.2d 1095, 600 N.Y.S.2d 433 (1993). There, the court addressed the situation in which a seller submits an idea to a buyer, and the buyer uses the idea but does not pay for it. It analyzed the problems that arise in such cases in the following manner:
 
 
 63
 [Submission of ideas cases] pose two problems for the courts. On the one hand, how can sellers prove that the buyer obtained the idea from them, and nowhere else, and that the buyer's use of it thus constitutes misappropriation of property?.... On the other hand, there is no equity in enforcing a seemingly valid contract when, in fact, it turns out upon disclosure that the buyer already possessed the idea.... A showing of novelty, at least novelty as to the buyer, addresses these two concerns. Novelty can then serve to establish both the attributes of ownership necessary for a property-based claim and the value of the consideration--the disclosure--necessary for contract-based claims.
 
 
 64
 Apfel, 81 N.Y.2d at 478, 616 N.E.2d at 1098, 600 N.Y.S.2d at 436. This quotation (especially the comment "at least novelty as to the buyer") illustrates that the term "novelty" is used in this line of cases in a very different, and much weaker, sense than it is used in patent law. Cf. 35 U.S.C. § 102 (defining novelty for purposes of patent law). Softel is not required on remand to show that the manner of combination of its various design elements was novel in the patent law sense.
 
 3. The Proper Measure of Damages
 
 65
 The district court based its calculation of Softel's trade secret damages on Dragon's profits. Softel III at C.L. pp 9-16. This was an appropriate measure of damages under New York law. See, e.g., David Fox & Sons, Inc. v. King Poultry Co., 23 N.Y.2d 914, 246 N.E.2d 166, 298 N.Y.S.2d 314 (1969). It then found that these damages were coextensive with the damages it had already awarded for copyright infringement, and that Softel therefore could not take its trade secret damages, as that would amount to double recovery. Softel III at C.L. p 17 (citing Altai, 982 F.2d at 720).
 
 
 66
 On this appeal, Softel seeks to avoid this result in two ways. First, it argues that its should have been awarded a "reasonable royalty" on its trade secret claim rather than lost profits. It calculates this royalty as its development costs multiplied by 3.5 to 5.5 (essentially to estimate profit). Alternatively, it argues that it should be granted the amount it would have charged for a source code license, because Dragon took its source code as well as its object code. It then goes on to argue, in essence, that selling such a license would have been like "selling the store," because Dragon took the "core technology" of Softel's company. Therefore, claims Softel, it should be compensated for all of the potential damage that Dragon could have inflicted by stealing the code. In making this argument, Softel points out that University Computing Co. v. Lykes-Youngstown Corp., 504 F.2d 518 (5th Cir.1974), listed "the total value of the secret to the plaintiff, including the plaintiff's development costs and the importance of the secret to the plaintiff's business" as a factor (among several) to be considered when calculating a hypothetical license as a measure of trade secret damages. See id. at 539.
 
 
 67
 This argument is flawed. University Computing itself rejected Softel's proffered measure of damages: it stated that such a measure usually was appropriate only where the defendant had destroyed the value of the secret. See id. at 535. Here, Dragon did not publish Softel's secrets, and therefore did not destroy their value to Softel, other than to the extent that Dragon itself used them.
 
 
 68
 Softel's second legal challenge to the calculation of the trade secret damages calls attention to the fact that its trade secret claim differs from its copyright claim in that the trade secret claim contains the additional element of secrecy. Without more, this is irrelevant: an element of liability does not, of its own force, generate damages.
 
 
 69
 We have recently stated that "[a]lthough the deference owed by an appellate court to a trial court's factual findings is a well established principle of law, in few areas of the law is this rule so generously applied as it is in the field of damages." Vermont Microsystems, Inc. v. Autodesk, Inc., 88 F.3d 142, 151 (2d Cir.1996) (citations omitted). Given this deference, and the fact that Softel has failed to establish that the district court miscalculated its trade secret damages, we affirm the district court's calculation, except insofar as it may be affected by our limited remand of the trade secret claim, above at section II(C)(2).
 
 D. Reverse Palming Off
 
 70
 At trial, Softel also claimed that Dragon's actions violated § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Softel claims that Dragon is guilty of "reverse palming off" because it failed to credit Softel when it did the following acts: demonstrated a program that incorporated Softel routines at an International Interactive Communications Society ("IICS") meeting; sent letters to the Kurta Corporation soliciting a co-marketing arrangement for several programs that included Softel code; and started a division within their company called Dragon Expert Systems and marketed it as capable of creating interactive programming.
 
 
 71
 The district court rejected these claims. See Softel II at C.L. pp 35-40. It found that Fiondella had not written the code underlying the program demonstrated at the IICS meeting, or, if he had, the contribution of his code was de minimis. See id. at C.L. pp 37-38 & n.3. It also found that the letters written by Dragon "merely state that Dragon has the present ability to produce interactive computer programs. They do not make any claim as to how Dragon gained the ability to produce such programs." Id. at C.L. p 40.
 
 
 72
 This Court has stated that a plaintiff alleging reverse palming off under the Lanham Act must prove the following: "(1) that the work at issue originated with the plaintiff; (2) that origin of the work was falsely designated by the defendant; (3) that the false designation of origin was likely to cause consumer confusion; and (4) that the plaintiff was harmed by the defendant's false designation of origin." Lipton v. Nature Co., 71 F.3d 464, 473 (2d Cir.1995) (citing Waldman Publ'g Corp. v. Landoll, Inc., 43 F.3d 775, 781-85 (2d Cir.1994)). We have also stated that the plaintiff is required to prove that "the defendant misrepresented an inherent quality or characteristic of the defendant's product." National Ass'n of Pharm. Mfrs. v. Ayerst Lab., 850 F.2d 904, 917 (2d Cir.1988) (internal quotation marks omitted).
 
 
 73
 We have reviewed the record and find sufficient evidence there to sustain the district court's finding that even if the program exhibited by Dragon at the IICS meeting did use Fiondella's image retrieval routines, these routines did not form an "inherent quality or characteristic" of the program for the purposes of § 43(a). Softel challenges this evidence: it argues that the court never examined the program that was actually displayed at the meeting because, Softel claims, the version of the program submitted by Dragon in discovery was different than the one displayed at the meeting. Softel made this same objection at trial and the district court received the program subject to the condition that the defendant connect it to the program shown at the meeting. On this appeal, however, Softel does not argue that receiving the evidence subject to connection was illegitimate, or that the program was not in fact subsequently connected. Therefore, Softel has waived its objections to the version of the program examined by the district court. The court's finding was not clearly erroneous; we affirm it.
 
 
 74
 We also affirm the district court's finding that Dragon's letters regarding Dragon Expert Systems do not violate § 43(a) because they merely asserted a present ability to produce certain programs. See Softel II at C.L. p 39-40. There was no "false designation of origin." Lipton, 71 F.3d at 473. This Court has stated that "as a matter of law, a false copyright notice alone cannot constitute a false designation of origin within the meaning of a § 43(a) of the Lanham Act." EFS Mktg., Inc. v. Russ Berrie & Co., 76 F.3d 487, 492 (2d Cir.1996) (quoting Lipton, 71 F.3d at 473); see also Kregos v. Associated Press, 937 F.2d 700, 711 (2d Cir.1991). Without a requirement of "some additional misrepresentation of originality beyond mere use of a copyright symbol, [plaintiffs] could convert all improper copyright claims into Lanham Act violations." EFS, 76 F.3d at 492 (citing Lipton, 71 F.3d at 473; Kregos, 937 F.2d at 711). Here, there was not even a misleading use of the copyright symbol. Therefore, Softel has failed to show this "additional misrepresentation of originality."
 
 E. Joint Liability of Dragon's President
 
 75
 At trial, Softel sought to establish that Hodge, Dragon's president, was jointly liable for Dragon's copyright infringement. Dragon moved at the close of Softel's case for dismissal of the claims against Hodge, on the ground of insufficient evidence. The district court granted this motion, on the ground that Softel had not produced evidence sufficient to establish a claim of contributory or vicarious liability.
 
 
 76
 The district court stated that it was dismissing Softel's claim against Hodge pursuant to Fed.R.Civ.P. 50(a), under a directed verdict standard. However, Rule 50(a) relates to dismissals in jury trials, and this was a bench trial. At the time of this trial, in April 1991, dismissals in bench trials "on the ground that upon the facts and the law the plaintiff had not shown any right to relief" were handled under Rule 41(b) of the Federal Rules of Civil Procedure. 9 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2371 (1995). The substantive provisions of this rule were moved to Fed.R.Civ.P. 52(c) shortly afterwards, in December 1991. See 9A id. § 2573.1, at 493 n.1 (amendment effective Dec. 1, 1991).
 
 
 77
 Softel argues that we should take the trial court at its word and test its dismissal of this claim by the then-Rule 50(a) standard, i.e., whether, drawing every inference and making all credibility assessments in favor of Softel, Softel had presented sufficient evidence to support a verdict. Dragon argues that we should not review the trial court in this manner since the court in a bench trial has the power to make its own assessments of the evidence and probably did so here. We agree with Softel that the court made no findings but dismissed the case against Hodge by holding as a matter of law that Softel could not recover under any view of the evidence presented.
 
 
 78
 However, this does not avail Softel because we also agree with the district court that, even drawing every inference in favor of Softel, Softel had at the close of its case failed to bring forward sufficient evidence to sustain its claims against Hodge. Therefore, no findings were necessary; indeed, they would have been an exercise in futility. To establish contributory infringement, Softel was required to show that Hodge "authorized the [infringing] use." Sony Corp. v. Universal City Studios, Inc., 464 U.S. 417, 437, 104 S.Ct. 774, 786, 78 L.Ed.2d 574 (1984). Softel points to no such showing prior to the district court's ruling, and offers no such evidence on appeal. To establish vicarious liability, Softel was required to show that Hodge had a "right and ability to supervise [that] coalesce[d] with an obvious and direct financial interest in the exploitation of copyrighted materials." Shapiro, Bernstein & Co. v. H.L. Green Co., 316 F.2d 304, 307 (2d Cir.1963). The only evidence that Softel adduced prior to the court's ruling relating to the issue of Hodge's supervisory capacities and financial interests was that Hodge was the president of Dragon and a shareholder.[12] The evidence is too attenuated to establish a sufficiently "direct" financial interest in the exploitation of copyrighted materials. Cf. id. at 308 (finding appellee vicariously liable because, inter alia, it received 10%-12% of the sales of the infringing materials).
 
 
 79
 Therefore, the district court properly dismissed the claims against defendant Hodge.
 
 III. CONCLUSION
 
 80
 The district court's dismissal of Softel's claims of non-literal infringement and trade secret misappropriation are vacated and remanded for further consideration consistent with this opinion. In all other respects, the district court's rulings are affirmed.
 
 
 
 [1]
 Where the district court has numbered its findings of fact ("F.F.") and conclusions of law ("C.L."), we will cite to those numbered findings or conclusions
 
 
 [2]
 "Paint and draw" programs enable the computer user to create graphic images on a computer screen. See Softel II at F.F. p 13
 
 
 [3]
 Source code is a series of instructions written in a computer language such as COBOL, BASIC, or FORTRAN. See Computer Assocs. Int'l, Inc. v. Altai, Inc., 982 F.2d 693, 698 (2d Cir.1992)
 
 
 [4]
 The "executable" is the version of the program that actually runs on the computer. See Softel II at F.F. p 11. It comprises linked modules of object code. See id. "Object code" is a machine-readable binary translation of source code. See Altai, 982 F.2d at 698. A "compiler" program translates source code into object code. See id
 
 
 [5]
 "Modules," or "subroutines," are discrete portions of a program that perform "subtasks." See Altai, 982 F.2d at 697
 
 
 [6]
 Fiondella also presented expert testimony for the plaintiff at trial
 
 
 [7]
 Our statement in A.A. Hoehling v. Universal City Studios, Inc., 618 F.2d 972 (2d Cir.1980), that "[t]here cannot be any such thing as copyright in the order of presentation of the facts, nor, indeed, in their selection," id. at 978 (quoting Myers v. Mail & Express Co., 36 C.O. Bull. 478, 479 (S.D.N.Y.1919) (L.Hand, J.)), may at first blush appear to contradict this. However, we have explained this statement as referring only to compilations of facts that fail to display the constitutional minimum of originality. See Arica Inst., Inc. v. Palmer, 970 F.2d 1067, 1075 (2d Cir.1992)
 
 
 [8]
 We also note that there may be protectible expression within an unprotectible element as well. Our scene a faire cases have made this point for many years. For example, in Walker v. Time Life Films, Inc., 784 F.2d 44 (2d Cir.1986), we observed that scenes a faire are not protectible "except to the extent they are given unique--and therefore protectible--expression in an original creation," id. at 50. Similarly, in Hoehling we stated the following:
 We are aware ... that in distinguishing between themes, facts, and scenes a faire on the one hand, and copyrightable expression on the other, courts may lose sight of the forest for the trees. By factoring out similarities based on non-copyrightable elements, a court runs the risk of overlooking wholesale usurpation of a prior author's expression. A verbatim reproduction of another work, of course, even in the realm of nonfiction, is actionable as copyright infringement.
 618 F.2d at 979-80.
 
 
 [9]
 In its briefs, Softel makes such statements as "[t]he District Court never discerned the structure of the program," and "[the court] did not examine the code of Plaintiff's computer program nor attempt to understand the purpose and function of Plaintiff's routines or subroutines or the structure of its program." If by these statements Softel means to argue that the district court was obliged to conduct its own inquiry of Softel's evidence sua sponte, then Softel misunderstands the role of the court in a proceeding such as this. Altai articulated the proper copyright analysis to be applied to evidence properly adduced in cases involving allegations of non-literal similarity in computer programs; it did not decree a new role for courts in adducing such evidence. Our statements in Altai referring to the court's role in analyzing non-literal infringement claims (for example, that "a court [should] first break down the allegedly infringed program into its constituent structural parts," Altai, 982 F.2d at 706 (emphasis added), or that "in a manner that resembles reverse engineering on a theoretical plane, a court should dissect the allegedly copied program's structure and isolate each level of abstraction contained within it," id. at 707 (emphasis added)), should be taken only as statements as to what the court should do to analyze evidence properly brought before it by a party. See Mitek Holdings, Inc. v. Arce Eng'g Co., 89 F.3d 1548, 1555 (11th Cir.1996) ("[I]f the copyright holder presents the court with a list of features that it believes to be protectable (i.e., original and outside of 17 U.S.C. § 102(b)), the court need not abstract further such features."). Therefore, we will take Softel's arguments that Judge Cannella inadequately analyzed their claims to refer only to the Judge's analysis of evidence that Softel properly presented to the Judge
 
 
 [10]
 It is also interesting to note that Dragon apparently understood Softel's claims to include a claim that the choice and manner of combination of the design elements were protectible expression. It argued that "[t]aken alone or together, each of these elements must be filtered out from the substantial similarity inquiry, since all are unprotectable as a matter of law." Def.'s Post-Trial Mem. at 45 (emphasis added and citations omitted)
 
 
 [11]
 We have held that New York law requires this same showing of "novelty" in a trade secret claim. See Hudson Hotels Corp. v. Choice Hotels Int'l, 995 F.2d 1173, 1178 (2d Cir.1993)
 
 
 [12]
 Softel asserts that Dragon had only five employees, apparently in support of a theory that any president of a five-person corporation would have the requisite control and financial interest to establish vicarious liability. In support of this fact, Softel cites two documents in the Appendix on this appeal. First, it cites Judge Cannella's findings in Softel II, but these findings do not consider the number of employees at Dragon. Second, it cites a Dragon payroll report that does appear to indicate only five employees. Softel neglects to mention that this payroll report was entered into evidence more than four years after the ruling at issue here, in the damages phase of the trial, before a different judge. We therefore decline to consider it